[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, Helen D. Legnos, commenced this action for a dissolution of the parties' marriage on the ground of its irretrievable breakdown by complaint returnable to this court April 27, 1993. She also seeks custody and support of the parties' minor children, alimony, a fair and equitable property settlement, and other relief as on file. The defendant husband admitted all of the allegations of the complaint; in his cross CT Page 12191-A complaint he seeks a dissolution of the marriage on the ground of irretrievable breakdown. He also seeks joint custody of the minor children, a fair and equitable distribution of the marital assets, and other relief as on file.
The parties and children were represented by counsel. The parents were ordered to participate in the Parenting Education Program, 1993 Public Acts No. 93-319. As the terms and conditions of the children's custodial placement were in dispute, the case was referred to the Regional Family Trial Docket (RFTD) (Steinberg, J.), where those issues were substantially resolved by agreement of the parties,[1] and the case was returned to this court for hearing on the financial issues.
At the trial, both parties testified and submitted financial affidavits and a child support guideline worksheet. A number of other witnesses testified, and numerous documentary materials were introduced into evidence. The parties waived oral argument and were granted until December 5, 1994, to file written briefs and proposed orders, which were filed, and the CT Page 12191-B trial is now completed.
From the evidence, I find as follows.
The wife, whose birth name was Helen D. Dickie, married the husband, Peter J. Legnos, in Hartford, Connecticut, on October 8, 1982. She has resided continuously in this state for more than one year before April 5, 1993, the date of the complaint. There are three minor children issue of the marriage: Kyle Dickie Legnos, born December 15, 1983; Alexandria Paige Legnos, born November 23, 1986; and Jane Hunter Legnos, born August 4, 1988. No other minor children were born to the wife since the date of the parties' marriage. All statutory stays have expired and the court has jurisdiction. Neither party or the children are recipients of public assistance.
The wife is 43 years of age and in good health. She is a college graduate with a major in early childhood education and psychology and a master's degree in legal studies and risk management. She is a certified paralegal assistant. She worked CT Page 12191-C briefly in the child development field. She was employed by Amtrak for five years, first as a claims agent, then as a legal assistant. She later worked at Aetna in the corporate law department on employment dismissal cases for about a year, where she earned approximately $22,000 per annum. After the marriage, she began working full time for the husband's solely owned boat business, now LBI, Inc., until the spring of 1993. She now works for the casino, Foxwoods, where she earns $615 per week gross, $437[2] per week net, as an analyst. She has significant vocational skills. Her job benefits include fully paid health and life insurance benefits.
The husband is 43 years of age, in good health and a high school graduate with one year of college. He has worked throughout his career designing, building, storing and selling boats. He also manages the parties' rental properties. He started his boat business in 1971, and later incorporated it as LBI, Inc. He is its sole stockholder and president. The business has substantially evolved into a mail order operation, with a very minor portion of its income coming from boat sales and storage He reports $725 per week gross income and $511[3]
CT Page 12191-D per week net income from his employment in his financial affidavit. His car expenses are also paid for.
This is the wife's third marriage; her first two ended in divorce. The husband has not been married before. Each party accused the other of improper and inconsiderate behavior as the cause of the marriage breakdown. A friend of each spouse testified and partly corroborated these assertions. The level of animosity between the parties is palpable and it is clear that the marriage has broken down irretrievably. However, on the state of the evidence, I cannot find that either party should bear a greater share of the responsibility for its destruction.
Commendably, the parties, with the help of the RFTD special masters under Judge Steinberg's program, were able to agree upon a detailed parenting plan for their three children which provided for joint legal custody. This was approved by Judge Steinberg and entered as a court order. The wife now seeks additional access during the following holiday weekends: Memorial Day; Labor Day; and Martin Luther King Day. She CT Page 12191-E suggests that the husband enjoy Columbus Day weekend. The parenting plan, which became Judge Steinberg's order, although providing for a rotational weekend schedule, Thanksgiving, Christmas and New Year's access and vacation visitation was silent on other specific holiday access. The court believes that these holidays should be alternated between the parties.
Unfortunately, the parties were unable to transfer their ability to agree upon the children's best interests to their financial disputes. This has been financially destructive to both of them and to LBI, Inc., which has been in Chapter XI bankruptcy proceedings since September, 1993. The parties have simply been unable to hammer out an agreement that would allow the Chapter XI proceeding to rescue LBI, Inc. from almost certain death. This has resulted in the maintenance and prosecution of a suit seeking to foreclose two of the parties' parcels of real estate and a suit against the defendant by the plaintiff's father to enforce a debt. The plaintiff has been cited into that case as a defendant entailing even more litigation, embroilment and consequent expense.
The parties jointly own five parcels of valuable real CT Page 12191-F estate. The husband owns 973 North Road, Groton, solely. These properties are valued in the aggregate at $2,130,000 by the husband. The wife provides a valuation of the jointly-owned properties at $1,260,000, and no valuation of the solely-owned property. The difficulty is that the properties are encumbered by first mortgages whose outstanding balances total $1,156,536 and past due real estate taxes of $90,314. Several of the properties are subject to a second mortgage held by Shawmut Bank, which the husband inaccurately states on his financial affidavit has a balance of $880,000, when the balance including late charges past due interest, etc., is about $750,000. He impeached his own affidavit by variously listing these obligations as $686,500 (motion by debtor, LBI, for authority to use cash collateral, Exhibit 1); $773,877 (work out agreement, Exhibit 6); $490,000[4] (Bankruptcy Petition, Exhibit I). When his affidavit is corrected by listing $750,000 as the second mortgage balance, this converts a negative equity of $1,536 to a positive equity in the real estate of about $128,500
The husband's financial affidavit assigns no value to his interest in LBI, Inc. While it is true that the corporation CT Page 12191-G is insolvent for bankruptcy purposes, as it could not pay its debts as they became due, it must be noted that the husband claims that the corporation owes him $663,000. This receivable, even though deemed worthless by the husband, is not reported on his financial affidavit. There was no expert evidence with respect to the value of the corporation's intangible asset; i.e., good will.
The corporation's bankruptcy attorney, Robert Evans, believed that the corporation was viable. The court agrees as it is evident that it has been operating under bankruptcy protection for about one year and one half and satisfying its current obligations. It has a staff of seven employees and meets its payroll including the defendant's salary. It pays $4,000 per month toward the second mortgage and $8,550 per month in rent to the defendant.[5] The latter is sufficient to cover the first mortgage payment on three properties. In addition, the corporation pays the current and past due real estate taxes, insurance and maintenance on the defendant's solely owned property. By means of the corporation's rental payments and those received from other tenants, the parties are able to CT Page 12191-H amortize approximately $2,000 per month in principal of the first mortgages. In short, the corporation, even under bankruptcy proceedings, is a cash cow.
Evans testified that Shawmut was willing to accept $400,000 in full payment of its obligations, which Shawmut's vice president, Brian Armogidda, testified totaled about $750,000, including principal, interest and late charges. See Exhibit 6.[6] Evans also testified that an investor[7] was available to provide those funds by buying out Shawmut's position, but was unwilling to do so because of the uncertainty and instability of the situation caused by the inability of the spouses to reach an agreement and maintain a common front vis-a-vis their creditors. Evans also opined that if the buy down agreement had been effected and performed, the corporation would be well on its way to reorganization and emergence from bankruptcy.
In this regard, the court finds that the plaintiff must bear a larger share of the responsibility for the impasse created, and as a result, she has gravely threatened the CT Page 12191-I financial future of the family, including herself and the children.
Despite the company's recent problems with regulatory agencies,[8] I find that LBI, Inc. has some potential value, and if its debt could be restructured, which seems probable, it would be viable and provide a source of income to the defendant in the future.
From the evidence, it is impossible to precisely determine the actual amount of interest due as debt service on the second mortgage. Thus, it appears that the net cash flow at the present time from all of the properties is negative to the tune of $99 per week, as reported on the husband's affidavit.
Both parties contributed substantial time, effort and funds to the corporation. Their families also contributed substantial funds.[9]
The wife's contributions included an inheritance of $100,000 from her aunt, $25,000 from the sale of her house in CT Page 12191-J Virginia and $12,000 from the sale of her boat.
At the same time, however, I must note that the wife's removal of the interest on the savings account she posted as a bond for the completion of the office building caused the husband needless difficulty, delay and expense, all of which could and should have been avoided by negotiation and common sense.
The parties and their children enjoyed a comfortable standard of living, which included the ownership of an airplane and large sailboat, and wanted for no material things.
The defendant had a net worth of about $475,000, including ownership of 973 North Road, Groton (the business property) when the parties were married. They commingled their funds during the marriage, and by the use of mortgages and savings, acquired the jointly-owned parcels. The business also provided the couple with substantial perquisites including car and vacation expenses, personal entertainment, and other non-business expenses including home utilities payments. CT Page 12191-K
On the basis of all of the evidence, I find that the husband's monetary contributions to the marital assets, before and during the marriage were greater than those of the wife, and that their non-monetary contributions were approximately equal.
I also find that they have equal employability, but that the husband has greater vocational skills, income and earning capacity than the wife has, and thus a superior opportunity to acquire capital assets and income in the future.
The defendant asserts that he should not be required to pay child support in the amount suggested by the child support guidelines, according to the worksheet filed by plaintiff, of $169.50 per week. In fact, he argues he should pay no child support at all. He claims a deviation from the guidelines because of the amount of time he will spend with the children under the joint custodial parenting plan agreed upon and ordered, and thus argues it would be inappropriate and/or inequitable to apply the guidelines mechanically. First, it is important to note that the court disagrees with the defendant's CT Page 12191-L deduction of $99 per week from the real estate operations from his net income in this child support determination. When added back, this makes his true net disposable income about $525 per week, and therefore, his child support obligation, as suggested by the guidelines, is at least $211 per week.[10] The defendant asserts the children spend approximately 50 percent of their "waking time" with him and points to Child Support and Arrearage Guidelines Regulations, § 46b-215a-3(b)(6)(A), "shared custody arrangements", as a deviation criteria.
The plaintiff, on the other hand, suggests that the defendant pay the sum of $400 per week as child support. The basis for this amount is not visible in the evidence or on the record and is contrary to the child support worksheet prepared and submitted by her. I find no justification for this amount which is almost equal to the defendant's net cash income flow.
The court agrees with the defendant's deviation claim, but only in part. Although I find that she has substantially overstated her weekly expenses, the wife does have considerable day care and `overhead' expenses which must continue. This is CT Page 12191-M so, even though the husband will have the children with him a substantial amount of the time. This appears to be about thirty (30%) percent of the total time during the four week cycle ordered by Judge Steinberg, which includes three of four weekends. In addition, the defendant has school vacation times and about one-half of the summer with the children.
General Statutes § 46b-215b requires that the child support guidelines must be considered in all child support determinations and that there is a rebuttable presumption that the guidelines support amount is the proper amount to be ordered. The statute further provides that the guidelines shall be considered in addition to, and not in lieu of the criteria established in § 46b-84. (Emphasis provided.)
The child support guidelines state, in part, as follows:
(8) Custody Adjustments
The Commission identified two categories of CT Page 12191-N custody arrangements for which special consideration should be given in setting child support awards. "Shared custody" exists where the parents substantially share the physical care and control of the child or children. "Split custody" exists where each parent has primary physical care and control of one or more of the children.
 In the case of shared custody, the Commission finds that where the dependent child spends substantial time in the care of each parent, this factor should be considered a reason for deviation from the guidelines. A specific adjustment factor is not included in the guidelines because such adjustments should only be made based on the totality of circumstances in individual cases, which will inevitably be more complex than can be adequately contemplated in a rigid mathematical formula.[11]
CT Page 12191-O
Over the entire year, it would appear that the children will spend more time with the mother than with their father. It is unnecessary and would be futile to fix a precise percentage of hours the children spend with each parent, as no formulaic approach would apply. It is evident that the parenting plan as agreed upon by the parties and adopted by Judge Steinberg, is a "shared custody" arrangement within the meaning of the guidelines, and the parties do not dispute this.
Indeed, a strictly mathematical approach in the determination of child support in "shared custody" arrangements would inevitably lead to unnecessary litigation and jousting over increments of time each party wishes to spend with the children, and absurd results in support determinations.
The court also must note that the mother has $100 per week of unreimbursed work-related day care expense, which is a disproportionate share of the child care expenses. The guidelines are clear that adjustments in child support obligations must be based on the totality of circumstances, and CT Page 12191-P the court does so here, and finds that the mechanical imposition of the guidelines would be inequitable and inappropriate and further finds that a payment of $160 per week for the three children as total child support is appropriate.
The court has considered all of the factors in General Statutes §§ 46b-62, 46b-81, 46b-82 and 46b-84 in the light of the evidence. The court has also considered the taxable implications and consequences of the financial awards set forth and the uncertainty relating to the rescue of LBI, Inc. from its insolvency. Accordingly, judgment may enter dissolving the parties' marriage on the ground of irretrievable breakdown, together with the following orders.
(1) Joint legal custody of the minor children is reaffirmed and awarded to the parties. The mother shall also have the children: Memorial Day and Columbus Day holidays in odd-numbered years beginning 1995, and the father in even-numbered years; and Martin Luther King Day and Labor Day holidays in even-numbered years beginning in 1996, and the father in odd-numbered years. Where there is a conflict between CT Page 12191-Q this holiday visitation and regular rotating weekend visitation, this specific holiday visitation shall supersede. Counsel shall also set forth in the decree all of the terms and provisions of the parents' access with the children stated in Judge Steinberg's order.
(2) The parents shall complete the Parenting Education Program, pursuant to 1993 Public Acts, No. 93-319.
(3) The defendant shall pay to the plaintiff the sum of $160 per week as child support, which shall be secured by immediate wage execution; the payments thereunder shall be made directly to the wife. The child support order and the parents' obligations for support are subject to the provisions of 1994 Public Acts, No. 94-61.
(4) (a) The plaintiff wife shall have the two oldest children as dependent exemptions for tax purposes; the defendant husband the younger child, so long as he is current on his child support as of the end of the claimed tax year.
(b) The wife shall maintain the children on her CT Page 12191-R job-related health insurance. Each shall pay one-half the unreimbursed/uncovered health care expenses. An order pursuant to General Statutes § 46b-84(c) shall enter. The defendant may remain covered under applicable law at his expense.
(5) The husband shall take and have free of the claims of the wife all of his right, title and interest in the LBI, Inc. stock, his notes receivable from the corporation; his hand tools; his Chelsea CD and checking account; the $2,000 bond with the Town of Groton; the fax machine, IBM computer, monitor, keyboard and software. The wife shall resign as employee and officer of LBI, Inc. He shall also continue to hold the children's savings accounts which he now has in his possession for their benefit until age 18.
(6) The wife shall take and have, free of the claims of the husband: the personal tangible property now in her possession; the 1989 Dodge motor vehicle; two window air conditioners; the teak bedroom set; the wicker campaign desk and CT Page 12191-S chair; the snorkel, mask, fins and weight belt; her 401K plan, her bank accounts; the 1992 tax refunds totaling $1,233; and the rent check of $2,700 held by her attorney. She shall also continue to hold the children's savings accounts now in her possession for the children's benefit until age 18 and the Templeton accounts in her capacity as custodian under the Connecticut Uniform Gift to Minors Act, General Statutes §§ 45a-546, et seq.
(7) The plaintiff shall transfer to the defendant by quit claim deed, all her right, title and interest in the following parcels of real estate, including rentals and tenants' deposits: Nos. 943, 952, 973, 979 and 993 North Road, Groton, Connecticut, and 12 Brentford Berwick, Ledyard, Connecticut, subject to all encumbrances thereon, including, but not limited to the first and second mortgages thereon, and real estate taxes, which he shall pay and save her harmless therefrom.
(8) The defendant shall simultaneously execute and deliver to the plaintiff a note secured by blanket mortgage on all of the above said properties in the amount of $95,000 CT Page 12191-T payable with interest accruing from the date of this decree at the rate of five (5%) percent per annum; the accrued interest to be added to principal. The note shall be paid by equal monthly payments of $500 per month commencing July 1, 1995, and the first of each month thereafter, and $1,000 per month commencing January 1, 1997, and a balloon payment of the then unpaid principal balance and accrued interest, if any, if not sooner paid, on or before December 31, 2000.
Said note and mortgage shall provide for automatic subordination to a new second mortgage on the said properties not to exceed the sum of $800,000, and an interest rate not to exceed the blended interest rate on the present Shawmut obligations, as calculated by commonly accepted banking principles plus two (2%) percent per annum, provided, however, the Shawmut obligations, (whether held by Shawmut, any of its divisions, or a successor investor) are paid via the new second mortgage refinancing. In the event of default or foreclosure of the plaintiff's mortgage or any prior encumbrance, the plaintiff's note and mortgage shall be non recourse as to $45,000 plus accrued interest thereon. Said note and mortgage CT Page 12191-U shall also provide for default if payment of any installment is not made within fifteen (15) days of the due date; that the wife shall be a named loss payee on all casualty insurance applicable to the mortgaged properties; that a default of any prior mortgages shall constitute a default of this mortgage (excepting that the present past due real estate taxes and delinquent Shawmut mortgage shall not constitute a default of the plaintiff's mortgage so long as the defendant maintains the current payment schedules); and for attorney's fees and costs of collection. Said note and mortgage principal balance shall become immediately due and payable upon default, the defendant's death or remarriage or transfer of title of any mortgaged parcel; excepting, however, he shall be entitled to partial releases of the wife's mortgage, upon payment to her of a sum not less than two-thirds of the net proceeds of any sale or refinance of any parcel (excepting the refinance of Shawmut's existing second mortgages), but in any event, for each such partial release, not less than $25,000, until said outstanding principal balance is paid in full.
(9) The defendant shall indemnify and save the CT Page 12191-V plaintiff harmless from all claims made by the plaintiff's parents.
(10) The defendant shall pay to the plaintiff the sum of $1 per year alimony, which shall only be modifiable upon motion by the plaintiff if he fails to: (a) pay at least $50,000 toward the principal, and all accrued interest thereon, due on the wife's mortgage described in paragraph 8 above; or (b) fails to fully indemnify and save her harmless from the indebtedness to her parents and the indebtedness to Shawmut. The alimony shall not terminate upon the wife's death or remarriage.
(11) No attorney's fees are awarded to either party.
(12) Each party shall be responsible for the obligations set forth in their respective financial affidavits filed November 2, 1994, and indemnify and save harmless the other, except as set forth specifically above, and except for the liabilities set forth below which shall be shared by them in the following proportion: defendant husband, two thirds; CT Page 12191-W plaintiff wife, one third; the children's attorneys' fees; Pine Point School; Sears' bill for the children's clothes; J. C. Penney's bill for the children; L M Hospital; Dr. Watts; Children's Dental Association; First Card VISA; and National Money Market.
(13) The wife shall irrevocably designate the minor children as equal beneficiaries of the life insurance policies set forth on her financial affidavit until each such child reaches the age of 19 or graduates high school, pursuant to 1994 Public Acts, No. 94-61(b), whichever first occurs. The husband shall do likewise on an insurance policy with proceeds of $40,000.[12]
(14) All documents of title and other instruments necessary or incidental to effect the orders set forth herein shall be completed and exchanged within thirty (30) days hereof.
Teller, J.